## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **RUSSELL TINSLEY,** | **Civil Action No. 15-7319(MCA)** |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **MERRILL MAIN, PH.D., STU CLINICAL DIRECTOR, et al.,** | |
| **Defendants.** | |

This matter having been opened to the Court by Defendants Merrill Main, Ph.D., R. Van Pelt, and Christopher Beaumont, Ph.D. ("the DHS Defendants") (ECF No. 222) on a motion for summary judgment as to Plaintiff Russell Tinsley's ("Plaintiff" or "Mr. Tinsley") remaining First Amendment retaliation claim against Defendants Main. For the reasons explained in this Opinion, the Court will grant the motion for summary judgment as to Defendant Main.

## I.     FACTUAL BACKGROUND & PROCEDURAL HISTORY[1]

For purposes of this motion, the Court construes the facts in the light most favorable to Plaintiff and also liberally construes the facts as he is proceeding pro se. In May 2010, Plaintiff was civilly committed to the Special Treatment Unit ("STU") as a sexually violent predator ("SVP") under New Jersey's Sexually Violent Predator Act ("SVPA"). Plaintiff appealed his commitment to the Superior Court of New Jersey, Appellate Division, which affirmed his commitment in an unpublished decision. *In re Civil Commitment of R.T.*, No. A-2521-13T2, 2016 WL 674215, at *1 (N.J. Super. Ct. App. Div. Feb. 19, 2016). Plaintiff was civilly

---

[1] Where necessary, the Court incorporates facts from the prior motions for summary judgment.

committed as a sexually violent predator due to his sexually related arrests and convictions.[2]  *See id.* at *2-5.

Merrill Main, Ph.D., is a licensed clinical psychologist and the Clinical Director at the STU and supervised the treatment of Plaintiff during the relevant time period.  (*See* ECF No. 195-2, Defendants' Statement of Material Facts "DSMF" at ¶ 1.)

It is undisputed that Plaintiff has submitted numerous grievances, complaints, and lawsuits related to his confinement in the STU.  The grievances, complaints, and lawsuits challenge Plaintiff's civil commitment, the inadequacy of his sex offender treatment, the failure to promote him to the next stage of treatment, and the restrictive nature of his confinement on the South Unit of the STU.  In his grievances, complaints, and lawsuits, Plaintiff also alleges misconduct by STU staff, including alleged retaliatory conduct by Defendants Main, the only remaining Defendant in this action.

Plaintiff's numerous grievances and lawsuits are recounted in the Court's prior Opinions, and Defendant Main, who is both a frequent recipient and target of the grievances, previously conceded that he is well aware of them.  (*See* ECF No. 195-3, Main Certification at ¶ 5, Ex. A and B; Plaintiff's Cert., Ex. A at 7-14.)  Plaintiff's penchant for filing grievances and lawsuits led to a confrontation between Plaintiff and Defendant Main on or about October 11, 2014, during which Defendant Main allegedly told Plaintiff he would never advance in treatment or get off the South Unit if he continued to file grievances and lawsuits.  To support this allegation, Plaintiff has submitted his deposition testimony in which he testified as follows:

---

[2] According to the Appellate Division decision, Plaintiff's prior court history shows at least seven sexually related arrests, including convictions in 1984, 1999, and 2005, in Philadelphia and San Francisco. Since age thirteen he has also been charged with multiple non-sexual offenses in Pennsylvania, California, and Nevada, including theft, burglary, fraud, assault, drug and weapons offenses, vehicular manslaughter, and failure to register.  (*Id.* at *1).

> Well, I approached Dr. Main on several occasions and he specifically make it clear, you know, Mr. Tinsley, you ain't [sic] never going to get off the South Unit because of your grievances. You filing your lawsuits and you'll never get off the South Unit Matter of fact, you know, all your chances of even getting out of here is being taken away from you. This guy specifically say [sic] this.

(ECF No. 224-4, Pl. Deposition (Jun. 28, 2018) 38:7-14.)  Plaintiff grieved the incident and the record contains a Remedy Form dated October 29, 2014, in which Plaintiff stated: "On Thursday October 11, 2014[,] after the Community Meeting with DHS staff[,] Merrill Main, STU Clinical Director made statements to me that may be Retaliatory …."  (*See* ECF No. 224-5.)  Defendant Main responded personally to this grievance, but his response is largely illegible.[3]  (*See id.* )

In the prior motion for summary judgment, Defendant Main averred that his concerns about Plaintiff's grievances and lawsuits were exclusively motivated by legitimate treatment concerns (*see* ECF No. 195-3, Main Cert. ¶ 5) and thus Plaintiff's retaliation claim failed pursuant to the Third Circuit's decision *Oliver v. Roquet*, 858 F.3d 180 (3d Cir. 2017).[4]  The DHS Defendants raised no other arguments in their motion for summary judgment as to Defendant Main.  The Court denied the motion for summary judgment as to Defendant Main, finding that that there were disputed issues of material fact as to whether Defendant Main targeted Plaintiff's filing of grievances (and not simply the collateral consequences of that protected speech), and, barring other arguments for dismissal, Plaintiff established a prima facie case of First Amendment retaliation.  (*See* ECF Nos. 205-06.)  The DHS Defendants

---

[3] In his certification to the Court, Defendant Main disputes that he made this statement, and asserts that he would never tell any resident that he could not advance in treatment if he continued to file grievances.  (ECF No. 195-2, DUSMF at ¶ 6.)

[4] In letters to Plaintiff dated October 7, 2014 and November 17, 2014, Defendant Main cautioned Plaintiff that his grievances, lawsuits, and legal arguments were interfering with his treatment. (ECF No. 195-3, Main Cert. ¶ 5, Exhibits A, B.)

subsequently sought and received permission to file a third and final summary judgment motion to address the so-called "same decision defense" and qualified immunity.  (*See* ECF No. 221.)

To further support his allegations that his lack of treatment progress and housing assignment are retaliatory, Plaintiff has submitted a "Confidential Report" dated September 9, 2015, prepared by Ronald G. Silikovitz, Ph.D., at the request of Plaintiff's public defender in connection with his civil commitment proceedings.  The Confidential Report, which recommends Plaintiff's release from the STU, is based on two interviews with Plaintiff, the administration of a Personality Assessment Inventory, and the review of Plaintiff's history and treatment progress at the STU.  (*See* ECF No. 224-6 at 1.)

As recounted in Dr. Silikovitz's Report, on or about June 25, 2014, a few months before Plaintiff's confrontation with Defendant Main, Plaintiff's treatment team recommended that he be promoted to Phase 2 of treatment and be provided with more treatment models based on his good behavior and progress.[5]  (*See id.* at 3.)  On October 31, 2014, around the time he filed his grievance about the confrontation with Defendant Main, the Treatment Progress Review Committee ("TPRC") at Plaintiff's annual review unanimously recommended that Plaintiff be advanced to Phase 2 of treatment based on his progression.  (*See id.*)

DHS Defendants do not deny that Plaintiff was promoted to Phase 2 in the Fall of 2014; however, they have submitted Plaintiff's most recent TPRC Report (hereafter referred to as "the 2019 TPRC Report"),[6] which explains that Plaintiff "had been promoted to Phase 2 following

---

[5] This information is contained in a Multidisciplinary Treatment Team Report (STIJ) dated June 25, 2014, and it is not clear when Plaintiff treatment team first recommended he be promoted.

[6] The 2019 TPRC Report is dated November 22, 2019 and signed by Paul Dudek, Ph.D., a STU Psychologist in the Special Treatment Unit; it was also reviewed by two additional psychologists who signed off on its contents.  The 2019 TPRC Report is based upon treatment notes/reports indicating the quality of Plaintiff's progress in treatment, consultation with Plaintiff's Treatment

the 9/2/14 TPRC review.  However, he was demoted to Phase l following the 8/30/16 review

based on his placement on Treatment Refusal status." (*Id.* at 1.)  The 2019 TPRC Report

recommends that Mr. Tinsley be maintained in Phase 1 of treatment.  (*Id.*)

As relevant here, the 2019 TPRC Report also summarizes Plaintiff's numerous

infractions which led to his placement on MAP[7] and Temporary Close Custody ("TCC")

between October 2014 and June 2019:

> Mr. Tinsley was placed on MAP after engaging in a physical
> altercation with another resident in his current process group on
> October 30, 2014. While on MAP status, on January 30, 2015, he
> was reported to have one of his "associates" misrepresent herself
> as an attorney, without any indication she was licensed to practice
> law, and placed on Room MAP at this time. On 2/26/15 Mr.

---

Team representatives, a clinical interview with Plaintiff, and all available discovery material
included in his STU file.  *See id.* at 1.

[7] MAP is a component of the clinical treatment program at the STU that focuses on stabilizing
disruptive or dangerous behaviors. *See M.X.L. v. New Jersey Dep't of Human Servs./New Jersey
Dep't of Corr.*, 379 N.J. Super. 37, 45, 876 A.2d 869, 873 (App. Div. 2005).  The New Jersey
courts have explained the treatment component as follows:

> There are four levels of MAP: Room, Tier, Wing, and Program.
> Room, Tier and Wing MAP restrict the unescorted motion of a
> resident to his room, his tier or his wing. The level of MAP
> placement is proportionate to the apparent danger or instability
> reflected by the resident. MAP levels represent an increasing return
> of privileges, culminating in a return to the general population with
> all privileges reinstated.

> Program MAP is the lowest level of intervention and is instituted
> when a resident is unwilling to control his anti-social behaviors
> and has not developed the behavioral skills necessary to maintain
> appropriate control. MAP can take a number of forms[, including]
> the suspension of privileges. While in Program MAP, a resident
> continues to attend all assigned treatment groups unless
> specifically contra-indicated. MAP status is generally implemented
> for thirty-day periods, with a review of that status every thirty days
> or sooner if clinically appropriate.

*Id.* at 873-74.

Tinsley was placed on TCC by DOC in response to reports that he was being threatened. He was taken off of MAP status on 6/29/15.

On 9/22/15 Mr. Tinsley was reported to write and publish a book titled "Civilly Committed," available to the general public for purchase, which consisted of content related to disclosure of the name of one of his victims, who was a minor at the time of the offense. This led to another MAP placement (program MAP) on above mentioned date.

Additionally, he was reported to continue to promote his pimpinentertainment.com website. On 5/6/16 Mr. Tinsley was placed in TCC for being found in possession of a credit card and accepted ownership of the credit card. On 8/17/16 program MAP was discontinued and it was indicated that Mr. Tinsley adequately processed his MAP placement.

Mr. Tinsley was again placed on MAP status on 7/19/18 for poor control of his anger, impulsivity, being verbally abusive and threatening, and severely disrupting the therapeutic milieu. After becoming sexually provocative in his statements towards a female facilitator, Mr. Tinsley became increasingly agitated and threatening in his demeanor after he was directed to leave the group. He continued to present in a menacing manner after leaving group. He remained on MAP status until 9/18/18 when he was placed in TCC after he was involved in a physical altercation with a peer. He remained on MAP status until December 2018.

He was placed on Temporary Close Custody on 6/7/19 due to notification from DC that he had made unauthorized phone call(s) that violated institutional rules.

(*Id.*)

The 2019 TPRC Report also summarizes Plaintiff's progress in treatment and his

placement on Treatment Probation and Treatment Refusal ("TR") for his failure to meaningfully

participate in treatment:

[Mr. Tinsley] is a generally opinionated individual who often perseverates on systematic and legal issues. While he can be re-directed, he generally will remain preoccupied with attempts to convince others of his presentation of being a person who has been unfairly persecuted by the legal system. He will typically frame his arguments through a religious context or through  legal arguments that are inappropriate or misinterpreted to  the context. Mr. Tinsley frames much if not all of his difficulties in establishing a positive trajectory in treatment on administrative and legal complaints that he is being punished for publishing a book that contained

identifying information of at least one victim and misconstrues multiple documents related to his treatment. In the course of individual treatment he has maintained that the publication of the book and maintenance of an online presence is his First Amendment right. He will present his history through a defense of minimization such as through admitting that he committed sexual offenses, but maintains that the encounters were consensual sexual experiences with adolescents.

At his request, three individual sessions were held with Mr. Tinsley. His treatment team noted that these appear to have some positive impact on him. It was noted that after these sessions, Mr. Tinsley was able to interact in a more positive and adaptive manner with his peers and treatment providers during group sessions.

Mr. Tinsley had originally been placed on Treatment Probation status on 10/22/15. However, he did not complete the recommended objectives of this status and was placed on Treatment Refusal status on 11/23/15. By 8/22/16 it was noted that he was removed from TR status based on one month of group attendance and he was then placed in treatment readiness status on the South Housing Unit. An inter-office Memo (dated, 8/25/16), subject "Treatment Refusal Status-Revised" indicated that although Mr. Tinsley has been consistently attending and participating in process group for over a month, he has not demonstrated that he has followed the treatment recommendation to remove his victims' names from the book he published. Mr. Tinsley's refusal to comply with this treatment recommendation compelled the DHS Treatment Team to place him again on Treatment Refusal status. His publication of "Civilly Committed!" available to the public through his website and Amazon.com has the names of two victims listed, demonstrating  not only "poor judgment and an inflated sense of self-importance, but also a complete lack of regard for the impact this might have on his victims. It was recommended that he "pull the 'book' from publication and sale to prevent further harm to his victims, but he refused to do so." This demonstrates an inability to utilize treatment in an effective or meaningful manner and the lack of understanding of how he is re-victimizing the victim by engaging in such behavior. Furthermore, it has been indicated that his narcissism and sense of entitlement continue to remain of significant clinical concern and viewed as a risk factor by his Treatment Team, as it connects to his sex offending behavior and the dynamics involved in self-satisfaction and sexual gratification.

Mr. Tinsley continues to be on Treatment Refusal status. Following his discharge from MAP status in August 2016 he was

transferred from a MAP oriented group to a Treatment Orientation Process Group consistent with his placement on TR status. He did not actively engage the group in matters directly related to his treatment concerns until February 2018 when he began to discuss his belief that his placement on TR status was unjust. He maintained that he should not be expected to discuss his offenses in the TOPG and that he does not need to remove the names of the victims from his book as he alleges that the victims provided consent for their names to be included.

Mr. Tinsley has maintained that he has committed two sexual offenses. This includes on [sic] in California in 1982 and a second in Pennsylvania in 2004. He maintains that there was no force used either offense and that both cases involved consensual sex with minors. In April 2018 he claimed that he met one of the reported victims, LA, while promoting a concert in the Philadelphia area. He claimed that while he met her in a high prostitution area, he began to date the woman and brought her to meet his family. He claimed that he would provide her with food and money. He claimed that on the day of the offense he met the victim at a hotel and that he brought food, alcohol, and marijuana for their use. He claimed that he told the victim that due to medical problems he would have trouble achieving and maintaining an erection but that he could still perform oral sex on her. He claimed that he left the room to get money that he promised her but, on his return, he found the victim robbing him of some of his possessions. He maintained that he did not physically or sexually assault the victim and that she had lied to him about her age. He also maintained that he believed several men in the lobby of the motel could have been working with her and assaulted him as a part of the robbery. In later groups Mr. Tinsley stated that he assumed full responsibility for his crimes. However, he remained evasive in noting what actions he performed to commit any crimes, the nature of the offenses, how he victimized others, or what the impact of his actions could have been.

Mr. Tinsley was again placed on MAP status on 7/19/18 for poor control of his anger, impulsivity, being verbally abusive and threatening, and severely disrupting the therapeutic milieu. After becoming sexually provocative in his statements towards a female facilitator, Mr. Tinsley became increasingly agitated and threatening in his demeanor after he was directed to leave the group. He had originally been discussing a submitted grievance but became agitated when questioned by the facilitator. He made a number of racial and misogynistic statements towards the facilitator and indicated that he hoped she would die. It was at this time he left the room only to return shortly after to retrieve a cup and again slamming the door on his way out of the room. He

continued to present in a menacing manner after leaving group. He waited for the therapists to leave the group and stormed past them mumbling under his breath. He slammed unit doors in the face of the facilitators. It was noted that when DOC personnel went to follow Mr. Tinsley, he had quickly left the area. He remained on MAP status until 9/18/18 when he was placed in TCC after he was involved in a physical altercation with a peer.

Mr. Tinsley at times struggled to make beneficial use of his time in the MAP group. He would indicate that he would not actively participate in the group as he intended to address the reasons he was placed in MAP through the legal system. However, it was opined by his treatment team at the time that he had been able to adequately address the behavioral concerns leading to his MAP placement by December 2018. At that time, he was released to general population. It should be noted that in June 2019 he was briefly placed in TCC once again due to reports from DOC that he had made unauthorized phone calls. Specifically, this appears connected to reports that Mr. Tinsley may have been engaged in having sexualized phone conversations with a 16-year-old female.

After having been released to general population in December 2018 and resuming treatment in his Treatment Orientation Process Group. It was noted that he showed some improvement in his ability to interact with pers [sic] and facilitators in the treatment sessions. Interestingly, Mr. Tinsley has shown attempts to be a leader in groups such as through being [sic] in a number of books about therapy into the sessions. This has led to some considerable discussion in groups on topics such as empathy. Mr. Tinsley has stated that his reflections about himself through his religion have led him to change his attitudes ad [sic] behavior.

Mr. Tinsley is not assigned any psychoeducational modules based on his treatment refusal status. To his credit, in past reviews it was noted that he had completed drafts of an Autobiography, a sexual history, an offense cycle, and a Personal Maintenance Contract. It does not appear from the available records that Mr. Tinsley has addressed these documents o[r] revised them since 2014. There is no evidence to suggest that Mr. Tinsley has made any attempts in the prior year to address the dynamic risks of re-offense sexually and has not demonstrated a sense of understanding or mastery of offense related dynamics or mitigation of risk factors associated with recidivism. Mr. Tinsley is not engaged in any substance abuse programming at this time. Based on his poor engagement in the treatment process, he is not at this time appropriate for referral to the Therapeutic Community.

The TPRC Report also includes a "clinical interview" with Plaintiff, in which Plaintiff

"complain[s] that he has not been given positive credit for engaging in treatment at the STU[]" and "describes himself as 'fully engaged' in the treatment process."  (TPRC Report at 12.) Plaintiff also "complain[s] at length that positive credit for any treatment gains has not been afforded to him because the STU administration is retaliating against him for publishing a book that includes themes specific to his civil commitment" and "went on to claim that he has addressed clinical concerns related to his history of sexual offending and has completed all the programmatic requirements including the sexual history, offense cycles, sexual history, and relapse prevention planning." (*Id.*) Plaintiff also repeatedly referenced the instant civil matter multiple times during the interview.  (*See id.* at 12-13.)   Plaintiff further asserted in the clinical interview that he wants to be placed in a formal Process Group and wants to complete additional modules and "complained, without merit, that he has been told by his group facilitators that here is nothing they can do to remove him from TR status."  (*Id.* at 13.)  Plaintiff, however,  "also went on to appropriately describe the clinical recommendations in place to be able to be moved off of TR status." (*Id.*)

During the interview, Plaintiff also downplayed his sexual offenses and convictions:

> In discussing his offenses of record, Mr. Tinsley stated that with the 1982 offense he was celebrating a promotion at a job at a club and met the identified  victim. He stated that he was around 22 or 23 at the time but did not know that the victim was 17 years old. He claimed that the sexual contact was consensual but because he would not accept a plea deal, the charges were inappropriately "upped" to a rape related charge. He denied engaging in any violence or threats with the victim. He claimed that he is still in contact with the victim. Mr. Tinsley stated that due in part to the perceived injustice of this event as well as his commitment, that a documentary was going to be made of his life. He then claimed he is in discussions for his life to be made into "a feature film" and that he wanted t[o] be discharged  so that the movie does not end with him still civilly committed.
>
> With regards to the 2004 offense he claimed that while he was in Philadelphia, he was treated for colorecta[l] cancer and as a result

he could not active an erection or ejaculate. He stated that he
"picked up a prostitute" and wanted to perform oral sex on her
until she reached climax. He stated he did this so as not to feel
"less than a man." He claimed he had known her for two weeks
prior to the incident. He claimed that they engaged in sexual
activity while at a hotel and that he had paid her. He claimed that
he briefly left the room to get food for them but when he returned
after realizing he left his money in the room; he found the victim
attempting to steal his money and jewelry. He stated that they
struggled when he went to grab his money back. He claimed that
the victim has told him that she regrets that he was wrongly
charged and convicted of a rape offense. He maintained a denial
that he had raped the victim.

(*Id.* at 13.)

According to the TPRC Report, Plaintiff "declined to participate in psychological testing

with the STU psychometrist" but was "administered the Psychopathy Checklist-Revised (PCL-

R), 2nd Edition during the 2014 TPRC evaluation." (*Id.* at 13-14.)  The Annual Report further

explains the purpose of the testing and Plaintiff's results in 2014:

The PCL-R provides a dimensional score that represents the extent
to which a given individual is judged to match the "prototypical
psychopath."  The higher the score the closer the match, and
presumably, the greater the confidence that the individual is a
psychopath (Hare, 2003, PCL-R Rating Booklet). The cut-off score
on the PCL-R indicative of psychopathy is 30. That is, an
individual who receives a score of 30 or above on the PCL-R
meets diagnostic criteria for psychopathy. Mr. Tinsley received a
score of 34 which suggests that he does meet the diagnostic
threshold for the construct of psychopathy (score of 30). When
psychopathy is viewed as a dimensional construct, a score of 34
falls into the High range. Mr. Tinsley received a score of 34 which
suggests that he does meet the diagnostic threshold for the
construct of psychopathy (score of 30). When psychopathy is
viewed as a dimensional construct, a score of 34 falls into the High
range.

(*Id.* at 14.)

Plaintiff was also administered the Stable-2007, which "was developed to assess change

intermediate term risk status, assessment needs, and help predict recidivism in sexual offenders,

and Plaintiff "scored a 19 out of a possible 24 points on the STABLE-2007[.]" According to the

2019 TPRC Report,

> [t]his score falls into the interpretive range considered to be High
> level of dynamic needs. Given his lack of an intimate relationship
> and poor relationship history, his poor behavioral  stability, non-
> compliance, interactions  with others, and significant difficulty in
> meeting his needs a majority of the dynamic risk factors in the
> STABLE-2007 were noted to be of clinical concern. These factors
> included: significant social influences, intimacy deficits, poor
> cognitive problem solving, deviant preference, hostility towards
> women, negative emotionality, impulsivity, general lack of
> concern for others, and rejection of supervision.

(*Id.* at 14.)

Finally, with respect to testing, Plaintiff was scored on the Static-99R, which "is intended

to position offenders in terms of their relative degree of risk for sexual recidivism based on

commonly available demographic and criminal history information that has been found to

correlate with sexual recidivism in adult male sex offenders." (*Id.*)  Petitioner received a total

score of 5, which places him at "above average" risk for being charged or convicted or another

sexual offense. (*Id.*)

The TPRC panel also determined that Plaintiff suffers from "Other Specified Paraphilic

Disorder (non-consent)," which means he experiences recurrent and intense fantasies, urges,

and/or behaviors involving sexual arousal to persons who, by virtue of force and/or their age, are

unable to consent." (*Id.* at 15.)  Review of prior documentation as well as the past TPRC clinical

interview indicates that Plaintiff "denies having a deviant sexual arousal and denies committing

sex offenses or reports the sex acts as consensual." (*Id.*)  Plaintiff also meets the criteria for

Antisocial Personality Disorder (with Narcissistic Features) "as he possesses features consistent

with the disorder, which causes clinically significant impairment in his social functioning." (*Id.*

at 16.)

At the conclusion of the TPRC Report, the panel summarized its findings and reached a concluded that Plaintiff should be maintained in Phase 1:

> Mr. Tinsley is a 64-year-old, single, African American male who was first arrested for sexual offending when he was 16 years old. He then went on to accrue a total of six sexual offense related charges and was convicted of three. He was most recently convicted of Aggravated Assault and Aggravated Sexual Assault for raping a 22-year-old female. His documented victims include known females, both adult and juvenile. His offending behaviors also vary in range from committing offenses involving rape to stalking. He has not been documented to take any responsibility for his sexual offending, as he denies his offenses or reports the sex acts as being consensual.

> Mr. Tinsley has also engaged in a number of nonsexual offenses including but not limited to distributing CDS, Altering Operators License, Vehicular Manslaughter, Mail Fraud, Aggravated Assault, and Theft. This range of behavior is reflective of the antisocial component of his personality structure. His antisocial orientation includes substance abuse, a criminal lifestyle beginning at a young age as well as poor compliance with supervisory conditions, as he has demonstrated a disregard for abiding by legal conditions implemented upon him by past criminal sentence and incarceration. Additionally, he has violated parole and has been charged with four Megan's Law violations. He offended sexually after being released from incarceration and continued to offend non-sexually while on probation. He has accrued infractions while incarcerated and has been placed on MAP status while at the STU. Overall, Mr. Tinsley's pattern of offending has not been deterred by numerous legal sanctions. This pattern reflects that it is highly likely that Mr. Tinsley will not cooperate with supervision or the demands of conditional discharge.

> In sum, the TPRC panel recommends that Mr. Tinsley be maintained in Phase 1 of treatment. This is consistent with his treatment team. He continues to be considered to be in the early stages of treatment. Currently, he remains on TR status. Mr. Tinsley should seek to meaningfully engage in his groups on a consistent basis, actively participate, refrain from any MAP placements or problematic behaviors, and demonstrate sustained motivation for treatment. In reviewing his static and dynamic risk factors and his current level of treatment, at this time, based on the information gathered for this evaluation, Mr. Tinsley continues to be at high risk to engage in future acts of deviant sexual behavior and presents at a high risk to recidivate if not confined to a secure facility such as the STU.

(*See id.* at 17.)

In his certification, Defendant Main characterizes Plaintiff as a Treatment Refuser, who denies that he has committed sexual offenses, disrupts group sessions by only discussing legal matters and by being verbally combative and volatile.  (Main Certification at ¶ 1.)   Defendant Main also asserts that Plaintiff cannot effectively participate in sex-offender-specific treatment because he consistently denies criminal wrongdoing, despite his substantial criminal history.  (*Id.* ¶ 2.)

In his deposition and certification submitted in opposition to Defendants' motion for summary judgment, Plaintiff denies that he has refused treatment, claims that he accepts responsibility for his sexual offenses, and reiterates his allegations that the treatment decisions and his placement in the South Unit have been orchestrated by Defendant Main in retaliation for his filing of grievances, lawsuits, and the book about his civil commitment entitled "Civilly Committed."  (*See, generally,* ECF No. 224-2; Pl. Dep. at 24:8-11; 28:13-16.)

Although he disputes Defendants' assessment of him as a treatment refuser who denies or minimizes his sexual offenses, Plaintiff's own Statement of Disputed Material Facts (ECF No. 224-1) engages in this very type of denial.  For example, Plaintiff states the following about his 1984 conviction:

> With regards to my conviction in 1984 of a sexual offense, I discussed that I had consensual sex and was falsely accused by the victim when her sister found out that we had been together.  I even presented to Court the affidavit of Harriet Williams,  an  attorney who represented me (Tinsley) in California, who indicated that she had information that the victim in this case had said that  had she been aware of how long the case would take and the severity of punishment Russell Tinsley faced, she never would have brought the charges against him, and was being forced  to testify by the prosecutor.

(ECF No. 224-2, Plaintiff's DSMF ¶ 28.)

## II.   <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law."  *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor .'"  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 447 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002).

The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment.  *Celotex*, 477 U.S. at 330.  "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." *Gleason v. Norwest Mortg.*, Inc., 243 F.3d 130, 138 (3d Cir. 2001).  The non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005) (quotations omitted).  Under *Anderson*, Plaintiffs' proffered evidence must be sufficient to meet the substantive evidentiary standard the jury would have to use at trial.  477 U.S. at 255.  To do so, the non-moving party

must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotations omitted); *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokle*y, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322–23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

A document filed pro se is to be "liberally construed" and "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). In addition, when considering a motion in a pro se plaintiff's proceedings, a court must "apply the applicable law, irrespective of whether a pro se litigant has mentioned it by name." *Holley v. Dep't of Veteran Affairs*, 165 F.3d 244, 247–48 (3d Cir. 1999). Nevertheless, on a motion for summary judgment, "a pro se plaintiff is not relieved of his obligation under Rule 56 to point to competent evidence in the record that is capable of refuting a defendant's motion for summary judgment." *Ray v. Fed. Ins. Co.*, No. 05-2507, 2007 WL 1377645, at *3

(E.D. Pa. May 10, 2007). "[M]erely because a non-moving party is proceeding pro se does not relieve him of the obligation under Rule 56(e) to produce evidence that raises a genuine issue of material fact." *Boykins v. Lucent Techs., Inc.*, 78 F.Supp.2d 402, 408 (E.D. Pa. 2000); *see also Dawson v. Cook*, 238 F. Supp. 3d 712, 717 (E.D. Pa. 2017).

### III.   ANALYSIS

Retaliation against a prisoner or civil detainee based on his exercise of a constitutional right violates the First Amendment. *See Bistrian v. Levi*, 696 F.3d 352, 376 (3d Cir. 2012) (citing *Mitchell v. Horn*, 318 F.3d 523, 529–31 (3d Cir. 2003); *Rauser v. Horn*, 241 F.3d 330, 333–34 (3d Cir. 2001); *Allah v. Seiverling*, 229 F.3d 220, 224–26 (3d Cir. 2000). In order to state a prima facie case of First Amendment retaliation, a prisoner must assert that: (1) he engaged in constitutionally protected conduct; (2) he suffered an adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) the constitutionally protected conduct was "a substantial or motivating factor" for the adverse action. *See Rauser v. Horn*, 241 F.3d at 333. A prisoner's ability to file grievances and lawsuits against prison officials is a constitutionally protected activity for purposes of a retaliation claim. *See Milhouse v. Carlson*, 652 F.2d 371, 373–74 (3d Cir. 1981); *Mitchell v. Horn*, 318 F.3d at 530; *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016).

The Third Circuit's decision in *Oliver v. Roquet*, 858 F.3d 180 (2017) controls the Court's analysis of the claims against Defendant Main. In *Oliver v. Roquet*, the plaintiff, also an SVP, was denied advancement to the next phase of treatment, and he sued a psychologist at the STU for allegedly retaliating against him for his own legal activities and his legal activities on behalf of other residents. The primary facts in support of the retaliation claim were contained in a report, which, among other things, suggested that the plaintiff may need to consider whether

his focus on legal activities was interfering with his treatment.  *See id.* at 185-86.  In *Oliver*, the

Third Circuit clarified the pleading requirements for a retaliation claim against a mental health

professional at a state institution, holding that "a prima facie showing of causation requires more

than the allegation that the professional based a medical decision on symptomology that

happened to relate in some way to a patient's protected activity."  Instead, there must be

particular facts alleged that allow the court to reasonably infer it is the protected activity itself,

and not simply medically relevant behavior associated with that activity, that formed the basis of

the defendant's adverse action."  *Id.* at 192.  Thus, after *Oliver*, to state a First Amendment

retaliation claim against a medical professional based on treatment decisions that seem to target

or affect a protected activity, a Plaintiff must provide facts showing that the medical professional

targeted the protected speech itself and not just the legitimate clinical or collateral consequences

of that speech.

      As explained by the Third Circuit,

> "[t]his is so because a medical professional's holistic approach to
> diagnosing a patient's mental health will sometimes require
> consideration of his otherwise protected speech and conduct to
> evaluate any adverse consequences they are having on his
> treatment. Framed in terms of the *Rauser* test and the relevant
> pleading standards, an assertion by a mental health detainee that
> his treating psychologist retaliated against him, based only on the
> factual allegation that the psychologist considered the effect his
> First Amendment activity was having on his treatment, would not
> support the inference that retaliation was the "substantial or
> motivating factor" for the psychologist's recommendation.

*Oliver*, 858 F.3d at 192.

      The Third Circuit further explained that a medical report or decision "purporting to focus

only on the collateral consequences of a detainee's First Amendment activity could be sufficient

to establish a prima facie case of retaliation where the plaintiff is able to plead 'consideration

plus,'—i.e., where, in addition to consideration of the protected activity by way of its association

with medically relevant conduct, there are specific factual allegations supporting an inference that the adverse action was based on the protected activity itself." *Id.* "Consideration plus" may exist, for example, where the complaint contained "specific factual allegations suggesting that the collateral consequences were fabricated, [allegations] that the defendant had communicated anger or frustration with the protected activity itself or had threatened to take action against the plaintiff, or [allegations] that the collateral consequences relied upon were irrelevant to the medical judgment in question." *Id.*

In its prior Opinion, the Court found that Defendant Main's statements to Plaintiff in early October 2014, that he would not be discharged from the STU or get out of the restrictive South Unit if he continued to file grievances and lawsuits provided the consideration plus, as required by *Oliver*, and, it proven, could allow a jury to find that Plaintiff satisfied the causal connection between his filing of grievances and/or lawsuits and his failure to progress in treatment thereafter and/or his continued confinement in the restrictive South Unit.  The DHS Defendants made no other arguments in favor of summary judgment as to Defendant Main, and the Court found that Plaintiff established a prima facie case of retaliation against Defendant Main in connection with his filing of grievances and lawsuits.[8]  (*See* ECF Nos. 205-06.)

The DHS Defendants now assert that Defendant Main is entitled to summary judgment 1) based the same decision defense applicable to First Amendment retaliation claims and 2) on the basis of qualified immunity.  The Court first considers the same decision defense.

---

[8] Although Plaintiff asserted that the DHS Defendants also refused to advance him in treatment based on the publication of his book "Civilly Committed", the record evidence in the prior motions showed that the collateral consequences of the publication of the book – namely Plaintiff's naming of his victims and denial and/or minimization of his sexual offenses and not the First Amendment activity itself motivated the DHS Defendants to encourage Plaintiff to redact and/or withdraw the book from publication.  Indeed there is no record evidence that Defendant Main sought to retaliate against Plaintiff for the publication of the book itself.

Even if a Plaintiff establishes a prima facie case of First Amendment retaliation, "prison officials may still prevail if they establish that 'they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest.'" This is often referred to as the 'same decision defense.'" *Watson*, 834 F.3d at 422 (citation omitted). The Third Circuit places the burden in prisoner retaliation cases on the defendant to establish the same decision defense. *See Rauser*, 241 F.3d at 333 & n.2; *Watson*, 834 F.3d at 429.

In prison disciplinary retaliation cases, courts "evaluate 'the quantum of evidence' of the misconduct to determine whether the prison officials' decision to discipline an inmate for his violations of prison policy was within the broad discretion we must afford them." *See Watson*, 834 F.3d at 426 (quoting *Carter v. McGrady*, 292 F.3d 152, 159 (3d Cir. 2002)). In *Carter*, an inmate claimed that he was given a misconduct because prison officials resented his functioning as a jailhouse lawyer. The Third Circuit, in rejecting that claim, held that most prisoners' retaliation claims will fail if the misconduct charges are supported by the evidence, explaining that "[e]ven if prison officials were motivated by animus to jailhouse lawyers, Carter's offenses, such as receiving stolen property, were so clear and overt that [the court] cannot say that the disciplinary action taken against Carter was retaliatory." *Id*. at 159. Thus, the Third Circuit "[could] not say that the prison officials' decision to discipline Carter for his violations of prison policy was not within the 'broad discretion' that [courts] must afford them." *Id.* (citations omitted) (emphasizing the "great deference" that the decisions of prison administrators are entitled to in the context of disciplinary proceedings). As explained in *Carter*, due to the "the force of the evidence that Carter was guilty of receiving stolen property" there could be no genuine issue of material fact that his misconduct citation was reasonably related to legitimate

penological interests, and that he would have been disciplined notwithstanding his jailhouse lawyering.  *See id.*

More than a decade later, in *Watson v. Rozum*, 834 F.3d at 425, however, the Third Circuit held that the plaintiff's violation in that case – his possession of a broken radio – "was not so 'clear and overt' a violation that [the court] can conclude that he would have been written up if he had not also given prison officials "a hard time" by asking for a grievance slip.  *See id.* The Court emphasized that the radio had allegedly been in the same condition for more than a year and there was evidence that other inmates had radios with loose or broken antennas, but those items were not confiscated and the inmates did not receive a misconduct.  *See id.*  Thus, defendant in *Watson* could not prevail on the same decision defense.

Plaintiff is an SVP who claims that Defendant Main, who admittedly oversees Plaintiff's treatment decisions at the STU, failed to advance him in treatment and is keeping him in a restrictive housing unit due to his filing of numerous grievances and lawsuits.  Although the Third Circuit has not considered the same decision defense in such a context, it noted in *Oliver* that where a plaintiff makes out a prima facie case of retaliation, "the burden shifts to the [D]efendant to prove by a preponderance of the evidence that [he] 'would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest.'" 858 F.3d at 190 (quoting *Rauser*, 241 F.3d at 333).

Defendant Main asserts that even if Plaintiff has made out a prima facie case of retaliation, Main (or his subordinates) would have made the same decisions – to not advance him in treatment and keep him on the restricted South Unit – based on Plaintiff's Treatment Refusal and other infractions and notwithstanding his filing of grievances and lawsuits.

In it undisputed that in order to progress through sex offender treatment, Plaintiff must discuss and take responsibility for his past sexual offenses. *See Salerno v. Corzine*, 06-3547, 07-2751, 2013 WL 5505741, at *2 (D.N.J. Oct. 1, 2013) (discussing the phases of treatment for SVPs and explaining that "[a]s residents progress through the phases, they are expected to discuss their sexual history and past sexual offenses. . . . [and] [r]esidents who 'refuse to participate in treatment in a meaningful way,' including refusing to 'discuss significant topics,' are put on 'Treatment Probation.' Residents who do not improve their participation in treatment are put on 'Treatment Refusal status'"). Here, the Court analyzes the quantum of evidence provided by the parties to determine whether Defendant Main (or his subordinates) would have made the same treatment and housing decisions absent Plaintiff's filing of grievances and lawsuits.

Having reviewed the record evidence in a light most favorable to Plaintiff, the Court finds that the 2019 TPRC Report provides overwhelming evidence that Plaintiff engages in Treatment Refusal by denying and/or minimizing his sexual offenses, by disrupting group sessions by being verbally combative and volatile, and by perseverating on legal issues. As such, the Court finds that Defendant Main (or his subordinates) would have made the same treatment and housing decisions absent Plaintiff's filing of grievances or lawsuits, and those decisions are rationally related to penological interests, or more accurately here, the treatment goals for SVPs.

Although Plaintiff disagrees with the 2019 TPRC report and the characterization of himself as a Treatment Refuser, the only evidence he has provided on this issue beyond his subjective opinion relates to his treatment progress in 2014. Although the DHS Defendants admit Plaintiff was initially promoted to Phase 2 of treatment in 2014, they have provided detailed evidence that Plaintiff was subsequently demoted to Phase 1 due to his Treatment

Refusal, namely his minimizing of his sexual offenses and his disruptive behavior.  Indeed, Dr. Silikovitz's Confidential Report, which was prepared at the request of Plaintiff's public defender in connection with his civil commitment appeal, does not address Plaintiff's Treatment Refusal and other incidents that occurred after the date of the Confidential Report.  The fact that Plaintiff's own Statement of Disputed Material Facts denies and minimizes his history of sexual offenses further corroborates the evidence presented by the DHS Defendants.  Plaintiff's subjective belief that he is participating in treatment and should be advanced to the next phase and moved from the South Unit is not enough to rebut the overwhelming evidence presented by the DHS Defendants or create an issue of fact for trial.

Because the DHS Defendants have met their burden to show the same decision defense applies, the Court will grant summary judgment to Defendant Main on Plaintiff's remaining First Amendment Retaliation claim.[9]

### IV.   **CONCLUSION**

For the reasons explained in this Opinion, the DHS Defendants' motion for summary judgment as to Defendant Main is GRANTED.[10]  An appropriate Order follows.

_____
Madeline Cox Arleo, District Judge
United States District Court

DATED: July 31, 2020

---

[9] Because the Court grants summary judgment based on the same decision defense, it need not reach the issue of qualified immunity.

[10] Plaintiff's motion to expedite is denied as Moot in light of this Opinion.